SK&F CO., Plaintiff,

v.

### PREMO PHARMACEUTICAL LABORATORIES, INC., Defendant.

Civ. A. No. 79–3434.

United States District Court,
D. New Jersey.

Dec. 19, 1979.

Carpenter, Bennett & Morrissey, Newark, N. J. by Donald R. Dunner, Washington, D. C., for the plaintiff.

Podvey & Sachs, Newark, N. J. by David B. Kirschstein, New York City, for the defendant.

## OPINION

BIUNNO, District Judge.

SK&F markets an oral diuretic under the brand name DYAZIDE, and the proofs show without contradiction that it has been so marketed since 1965 in a No. 3 hard gelatin capsule, half maroon and half white. The medication is a prescription drug consisting of 50 mg. of triamterene and 25 mg.

of hydrochlorothiazide plus inert ingredients.

The application of triamterene (a previously known substance) for use as a diuretic and hypotensive agent is the subject of United States Patent No. 3,081,230 issued March 12, 1963, and owned by SK&F. A combination of triamterene and hydrochlorothiazide (within specified ranges) is also within the claims of the same patent.

Since late November, 1979, Premo has been marketing to distributors its own so-called generic equivalent under the name "Triam-Thiazide."

This medication has been packaged in a trade dress which concededly imitates as closely as possible the capsule trade dress of SK&F's DYAZIDE.

Promptly after learning of Premo's activity, SK&F filed a complaint, together with supporting affidavits and exhibits, with claims of both patent infringement and unfair competition in the copying of trade dress.

With these papers there was submitted a brief and order to show cause with temporary restraints limited to the patent infringement aspect. When the papers were received, the Court was in the 12th consecutive week of a criminal jury trial which counsel had indicated would likely run to the end of December. On review of the papers the Court felt the draft order should not be entered as submitted for two reasons:

One was that the Court rarely grants an order with temporary restraints without some hearing from both sides on the issue, and the ongoing criminal trial made such a hearing impossible. The other reason was that since there is very limited time available for hearings on preliminary injunctions in the face of an extremely heavy criminal calendar, interests of judicial economy called for a single hearing on the demands in the complaint for preliminary injunction on both the patent infringement and unfair competition aspects.

The patent, on its face, runs out on March 12, 1980. Any preliminary injunction to

restrain patent infringement, if granted, could not run beyond that date. After that date Premo will be free to engage in conduct that before then would constitute infringement if the patent be valid.

Since the issue of unfair competition arising out of a copying of trade dress would obviously have continued significance regardless of the outcome of the patent claims, and would be bound to arise in a few months—sooner rather than later—the Court drew and entered its own order to show cause on December 3, 1979, after a full weekend review of the considerable submissions, to encompass both aspects for preliminary injunction. It also provided means for a prompt and short period of discovery and setting a hearing date of December 17, 1979, at 2:00 p. m.

At the conclusion of the hearing at about 9:30 p. m., the Court ruled that the preliminary injunction on unfair competition should be granted, and reserved on the patent infringement issue which is more technical and requires further study.

A number of points are not in dispute and should be listed.

Both these prescription drugs contain 50 mg. of triamterene and 25 mg. of hydrochlorothiazide per capsule. Both are packaged in number three hard gelatin capsules. Both are colored with one-half in maroon and the other half in white. SK&F's capsule has the brand "DYAZIDE" and the logo "SKF" printed on both halves. Premo's capsule has its name and brand printed on both halves. SK&F's capsule has somewhat conical ends, as evidently do the hard gelatin capsules of all its products so packaged. Premo's capsule is the standard one with hemispherical ends.

A number three hard gelatin capsule is quite small, being about a half-inch long. The printing is necessarily very small. The printing on the maroon half, which is black printing for both capsules, is nearly impossible to read against the maroon background. The printing on the white half, having more contrast, is easier to read, but is about the size of the "series" designation on a dollar bill.

On the sole question of trade dress, as embodied in the capsule, the Court finds that Premo's capsule is as close to an exact copy of SK&F's as is possible to come and still argue that there are differences.

If this were a case in which the issue were whether an item of currency such as a ten dollar bill was genuine or counterfeit, the differences here are of the order of printing this year a series designation of 1999 or, on the back of the bill, printing "In Cod We Trust." Such a counterfeit bill, otherwise a perfect copy in all respects, like Premo's capsule, would be fishy.

There is no need to explore the question of intent. Premo claims the right to copy the capsule trade dress as closely as it can. There is no fact issue that the copying imitation was intentional and deliberate.

Premo, of course, has the right to make the claim, and to copy as closely as it thinks it can, intentionally and deliberately. There is no question about its right to make the claim, but, having done so intentionally and deliberately it cannot complain if its conduct turns out to be a calculated risk on which the outcome is adverse.

Putting aside the patent infringement issue, not yet decided, Premo's argument comes down to several specific propositions.

One is that no one can obtain a monopoly in a color or combination of colors. This proposition may be true in a general sense, but it does not follow that the composite of a specific trade dress may be copied with impunity merely because one of the features happens to be color. Trade dress is a complex composite of features. One may be size, another may be color or color combinations, another may be texture, another may be graphics and arrangement and so on. Trade dress is a term reflecting the overall general impact, usually visual, but sometimes also tactile, of all these features taken together. The law of unfair competition in respect to trade dress requires that all of the features be considered together, not separately.

A competitor of American Tobacco Company, for example, could hardly expect to escape an injunctive order if it tried to market cigarettes in a red package with white lettering, under the phonetic brand "PELL MELL" with a coat of arms ribboned in French "Honi Soit Qui Mal Y Pense", and bottomed with the slogan "Wherever People Congregate Particularly." Take a look at a package of these well-known cigarettes and think about small changes like these that could be made that not too many would recognize or notice, and then consider whether barring such an imitation carries any implication that American Tobacco Company has acquired a monopoly in the color "red."

■ The second point is that Premo claims SK&F has failed to show the development of secondary meaning for its trade dress. This argument is plainly frivolous. It is proven by the submissions, and not denied, that SK&F's DYAZIDE is the *only* oral diuretic on the U.S. market which is packaged as a hard gelatin capsule. All the competitive prescription drugs are packaged as tablets of one or another shape or finish or color. Not only that, but it has been so marketed, in maroon and white, since 1965, and has achieved the highest volume of sales, both as doses and dollars, of any brand or class of oral diuretics. Since the product is a prescription drug its selection implies a very large number of professional decisions by physicians who have considered all they know of the diagnosed condition, prognosis and treatment of a very large number of specific patients and who have in consequence prescribed DYAZIDE. These individual professional decisions aggregate decisions for millions of patients each with his own complex of ailments and conditions in which DYAZIDE was prescribed rather than some other competitive oral diuretic prescription drug.

It is difficult to conceive of a set of circumstances that could make a stronger case for showing the achievement of secondary meaning. The product itself—the medication within the capsule—is unique in the field of diuretic prescription drugs, and

has been sold nationwide in enormous volume for some 14 years. Since the record shows that this prescription drug is for the treatment of ailments that generally require extended therapy, the Court finds that secondary meaning has been shown abundantly.

■ The more novel argument of Premo is based on the proposition that the "generic drug" movement reflected in the legislation of most if not all of the 50 States requires that the trade dress of branded prescription drugs be copied as closely as the law allows so that a patient as to whom a generic substitution may be given by a pharmacist, (A) will enjoy the monetary benefits of lower price said to be typical of generic equivalents, (B) will not be upset by receiving a generic equivalent that has a clearly different appearance.

Although ingenious, the argument comes down to one calculated to encourage fraud and deception. It does so in a field of endeavor having a most vital and important public interest, namely the proper dispensing of prescription drugs.

■ Premo argues that "generic equivalent" laws provide ample sanctions for violations. Criminal charges may be brought. Petitions may be filed with boards regulating the practice of pharmacy. Civil suits may be brought. That such remedies exist is recognized, but they are far from adequate when the public interest, which in a field like this comes down to individual patients, is considered.

In criminal proceedings the burden of proof is extremely high—"beyond a reasonable doubt." In regulatory or civil action proceedings the burden is still on the claimant even though it be a simple preponderance. When trade dress for a particular kind of prescription drug is as unique as it is here and the trade dress is slavishly copied, how can it be expected that the burden of proof can be met when all the pharmacist has to say—and without any witnesses to contradict what he says occurred in the privacy of the prescription area of his drug store—than this: "I must have made a mis-

take. The two capsules look so much alike. I didn't mean it."

Or he can easily testify, without fear of contradiction, that he did not substitute the generic equivalent but filled the prescription with the branded product. The label on the vial says so. His own records say so. The capsules themselves are gone, ingested by unsuspecting patients. These alternative remedies, whether taken separately or together, fall far short of being adequate in a sensitive field like that of marketing prescription drugs. A multiplicity of actions, whether criminal, regulatory or civil, provide but a pale substitute for the equitable remedy of injunction which acts upon the source itself and thus eliminates the need for difficult and expensive policing of countless pharmacies and is able to destroy the proliferation of the weed, root, branch and seed.

Prophylaxis is not only a medical term. It is also a legal term expressing methods for preventing intentional or accidental violations of the law.

█ Premo argues that the printing of the name and logo on the capsule is enough to serve the purpose. The Court does not agree. The easily seen features of the trade dress—the capsule, its size and its colors—are like the large print which giveth, while the differences are like the small print which taketh away.

Premo's argument that all generic equivalents ought to be marketed in substantially similar trade dress also fails to hold up. As the record shows, by reference to the PDR, a publication of which the Court takes judicial notice, Federal Evidence Rule 803(17), as a published compilation generally used and relied on by physicians and pharmacists (persons in particular occupations); there is at least one prescription medication mentioned at the hearing whose manufacturer offers it in the same dosage in both tablet and capsule trade dress and in four *differently colored* capsules which vary only by dosage. This single example belies the Premo argument on this score.

Corroborating this analysis is the claim made by Premo that it possessed an exhibit (not on hand at the hearing) consisting of a color photograph of an array of branded prescription drugs in one column and of generic equivalents in nearly identical trade dress in the second column. This exhibit, if produced, was intended to show the existence of a practice by generic substitution enterprises to copy the trade dress of branded products. The Court suggested that if a given medication were marketed by a plurality of manufacturers in distinctively different trade dress from each other, SK&F could easily prepare a controverting exhibit showing that the generic equivalents had a different trade dress than the branded prescription drugs. Premo said that such an exhibit could be prepared and for that reason it was unnecessary to perform the exercise of preparing, presenting and examining the conflicting exhibits.

Obviously, when a prescription drug is marketed in a variety of trade dresses, the competitor who wishes to enter the field is faced with some decisions. Economic considerations may induce him to copy the trade dress of the leading brand of the array. If he does that, his substitution will not look like the trade dress of the other branded products and the argument for identical or nearly identical appearance is lost. The other choice is to put economic considerations aside and to copy the unique trade dress of each and all the branded products. To take that course implies that there will necessarily be some kind of understanding or arrangement between the generic supplier, his wholesale distributors and retail pharmacies that generic substitutions should be made on the basis of trade dress. Such an understanding or arrangement not only smacks of a conspiracy to achieve a lawful purpose by unlawful means, but it also establishes beyond doubt that the trade dress reflects the brand and the origin rather than the medication itself.

Part of this theme was grounded on the implication that the copying and sale of imitations of branded prescription drugs advances the goals of generic substitution laws. The Court vigorously disagrees. The

Court finds that such conduct conflicts with and undercuts the goals represented by generic prescription laws.

In the first place, Premo and other generic substitutors are not charitable organizations. It and they are in business for a profit. Since their marketing style is to claim the same product at a lower price, profit can only be realized by avoiding one or another cost and riding someone else's coattails and copying the trade dress.

An enterprise with profit making motives of this kind is clearly not acting in the public interest. It is more like the wolf in sheep's clothing.

■ If there is any one aspect developed by the law in recent years in the health field, it is the concept of informed consent. A patient who is prescribed DYAZIDE, or LIBRIUM, or DARVON ought not to be exposed to the unknown risks of having the prescription filled with an allegedly "generic equivalent" whose trade dress looks essentially the same as the medication he recognizes, and to be given a vial with the branded article typed on, and charged the price of the branded article to boot.

The Court expresses no view or criticism about the wisdom of generic substitution laws. It notes their wide adoption, but, prescription drugs being the consumables they are, it is obvious that the trade dress of a generic substitute ought to be as different as possible than the branded medication named in the physician's prescription and typed on the label.

■ It may be that all or most of the advertising and detail services of pharmaceutical manufacturers are rendered to professionals rather than to the patient. But if there is to be a substitution, even a lawful one, the only opportunity the patient will ever have to question the switch is when the trade dress is distinctively different. Only this approach can provide any kind of rational basis for informed consent.

Dealing as it does with prescription drugs, the subject is of considerably more importance than branded oranges or bananas or face powder or soap or toothpaste, all of which are entitled to trade dress protection. The element of public interest in the sense of individual patients with individual complexes of ailments and conditions, is of exceptionally heavy weight in a case like this.

The point is boldly underscored by the affidavit of Walter Epler filed by Premo on the hearing date, and asserting that preliminary tests performed for Premo by a laboratory indicates that Premo's product has a higher absolute bioavailability than SK&F's product. Bioavailability is an index of the extent of the medical efficacy of the prescription drug. It is related to dosage. If it be true that Premo's substitute has higher bioavailability, then the claim of equivalence and with it the justification offered for copying, is destroyed. The contents of the capsule of both parties contain the same amounts of each active ingredient, as noted above. But, if Premo's product has higher bioavailability, the products are obviously different for that characteristic. Since dosage is a function of the dosage, ranging from one capsule every other day to perhaps two capsules a day, the substitution of Premo's look-a-like product, if it has greater bioavailability as sworn to, means that the patient will receive more medication with Premo's product than the physician intended when DYAZIDE was prescribed. This makes the public aspect consideration of a special concern to the Court on the issue of trade dress. The fact that substances bearing the same name are not necessarily the same, along with a review of the history of pharmacoepoeias and other related background subjects, has already been explored in depth in *United States v. An Article . . . OVA II*, 414 F.Supp. 660 (D–N.J., 1965), affirmed 535 F.2d 1248 (CA–3, 1976), and need not be repeated here.

■ The subject of needless imitation, not to mention imitation that carries risk to health and safety, has never been better expressed than it was nearly 70 years ago in *Florence Mfg. Co. v. J. C. Dowd & Co.*, 178 F. 73, at 75 (CA–2, 1910): "It is so easy for the honest business man who wishes to sell

his goods upon their merits, to select from the entire material universe which is before him symbols, marks and coverings which by no possibility can cause confusion between his goods and those of [his] competitors, that the courts look with suspicion upon one who, in dressing [the] goods for the market, approaches so near to his successful rival that the public may fail to distinguish between them."

■ On the unfair competition and copying of trade dress issue, therefore, the Court finds that, particularly for this subject field: one, plaintiff has established a very strong case for ultimate success on the merits. Two, the damage is clearly irreparable, not only as to plaintiff, but as to a potentially large class of unidentifiable individual patients who comprise the general public for whom oral diuretics are prescribed. Three, a balancing of the equities between the parties is clearly and convincingly in favor of prompt and immediate injunctive relief pending final hearing. Four, the public interest, in light of the many and different generic drug laws of the various States, requires that the individuals making up the aggregate of patients for whom plaintiffs' product is prescribed by physicians on the basis of examination, diagnosis, prognosis and treatment, requires that if substitutions are allowed by law their trade dress should be as different as possible from that of the prescribed brand, so as to provide each patient with a reasonable basis for informed consent to accept the substitute.

■ After the Court's ruling was announced, Premo asked for a stay pending appeal. This matter was heard and the Court concluded that stay pending appeal should be denied. One reason is that evidence has been introduced indicating a financial inability of Premo to pay damages, not only in this action but in a number of others which are pending in various Courts. Plaintiffs' evidential submission on the financial condition of Premo was not addressed in any answering proofs. It is taken as admitted.

Important as this consideration may be, the Court feels that a stay pending appeal should be denied for a much stronger reason. Once the order is signed, there should not be another Premo capsule substituted for a DYAZIDE capsule on a look-a-like basis. There should not be one patient exposed to the risk of being harmed by a generic substitution of which the patient is given no fair basis for informed consent.