BIOCRAFT LABORATORIES,
INC., Plaintiff,

v.

MERCK & CO., INC., Defendant.

No. Civ. 77–693.

United States District Court,
D. New Jersey.

Oct. 2, 1980.

Franzblau & Falkin, Newark, N. J., for plaintiff; Robert J. Bajefsky and Donald R. Dunner, Washington, D. C., of counsel.

Shanley & Fisher, by Frank L. Bate, Newark, N. J., for defendant; Nels T. Lippert and Carroll Harper, New York City, of counsel.

## OPINION

BIUNNO, District Judge.

Merck & Co. (Merck) manufactures and markets a pharmaceutical medication, amitriptyline HCL, under the trade name ELAVIL *. The medication is described as a white or practically white crystalline powder freely soluble in water. Merck has marketed it since April, 1961.

Biocraft Laboratories, Inc., (Biocraft) a generic drug competitor, also markets amitriptyline HCL (though it does not manufacture the active ingredient as Merck does).

The medication is an antidepressant with an anxiety-reducing, sedative component to its action, although the mechanism by which it functions is not precisely known. It is indicated for the relief of symptoms of depression, particularly endegenous depres-

* Trade mark or trade name.

sion, and depression accompanied by anxiety. As disclosed by the text of Physician's Desk Reference (PDR), there are a number of conditions which contraindicate its use, as well as a number of potential side effects in particular patients (i.e., those with urinary retention, angle-closure glaucoma or increased intraocular pressure, pregnancy, etc.), and potential adverse reactions and precautions which call for close professional monitoring of such patients.

Because of the potentially harmful effect and the collateral measures necessary to its use, 21 U.S.C. § 353(b)(1)(B), the drug container, before dispensing, must bear on its label the statement: "Caution. Federal law prohibits dispensing without prescription", absent which the drug is deemed "misbranded", 21 U.S.C. § 353(b)(4).

It is also a prescription drug under New Jersey law, N.J.S.A. 45:14–6, 45:14–14, 45:14–26.1, and it does not come within the exception for "non-poisonous patent or proprietary medicine" or "simple nonpoisonous domestic remedy", N.J.S.A. 45:14–29.

Aside from claims and counterclaims involving the validity and infringement of a Merck "use" patent, and other issues, the case involves a dispute on issues of unfair competition and violation of the Lanham Act, and it is these latter issues only that were brought before the court on Merck's motion for summary judgment.

The motion was originally filed March 24, 1980, returnable April 14, 1980. It was continued to May 12, then to June 9, and to June 16, 1980 when an entire day was devoted to the hearing.

Merck markets ELAVIL * in two forms. One is a clear, colorless solution in vials of 10 milliliters (cc) each, in a concentration of 10 mg. per ml., for injection. The other form is in round, film coated tablets in various dosages: 10 mg. are blue, 25 mg. are yellow, 50 mg. are beige, 75 mg. are orange, 100 mg. are mauve. A 150 mg. tablet is capsule shaped, film coated, in blue. (See PDR, 1980). The 10 mg. and 25 mg. dosages were the first ones marketed by Merck. The 50 mg. dose was marketed in 1967, and the 75 mg. and 100 mg. doses were marketed by Merck in 1975. These dates appear in the stipulation of the parties. The 150 mg. dose, in capsule shaped, blue tablet, appears to have been marketed by December, 1976, judging from information in the 1979 PDR.

In any event, Biocraft began marketing amitriptyline HCL from about March, 1977, in round, film coated tablets as close as possible to the sizes and colors of Merck's. There is no question that the trade dress copying was deliberate, in view of the testimony of Biocraft's president on deposition.

It is also a fact not in dispute that Biocraft markets its product as a generic substitute for ELAVIL *. It has obtained an abbreviated NDA as a "me-too" drug, and it appears in the Pennsylvania formulary as a generic, under the name amitriptyline HCL. Although Biocraft does not manufacture the active ingredient but only the tablets, it is listed as a "manufacturer" supplying various distributors identified as Spencer-Mead, Vanguard Labs, Theda Corp., H. L. Moore Drug Exchange, Rugby Labs, West-Ward, United Research Labs, Steri-Med, Geneva Generics, Lederle Labs, Towne Paulsen, Parmed Pharmaceuticals, Three P Products and Purepac Pharmaceutical. It also shows that Phillips Roxane manufactures for SK & F.

In the New Jersey formulary, second edition, October, 1979, acceptable manufacturers of amitriptyline HCL are listed as Barr, Biocraft and Merck. The February, 1980 supplemental bulletin lists Phillips Roxane and Roche as additional acceptable manufacturers.

The large chart with actual samples of the tablets marketed by various sources shows that four pharmaceutical companies market this medication under their brand and trade-name. These are: Roche (Endep)*, Parke-Davis (Amitril)*, Squibb (Amitid)* and Merck (Elavil)*. While each of these uses a different color for each dosage, none uses the same colors as any other. The same is true of SK & F, which markets as a generic. It uses different colors than any of the others.

The "Guide to Prescription Costs", issued by the U. S. Department of Health and Human Services, dated April, 1980 contains listings for amitriptyline HCL at pp. 139–140 in the category of "psychotherapeutic drugs", in the sub-class "anti-depressant drugs". The other drugs in the subclass are (1) combinations of amitriptyline HCL and perphenazine, in varying proportions and dosages, (2) desipramine HCL, (3) doxepin HCL, (4) imipramine panioate and (5) nortriptyline HCL. For the specific sub-class amitriptyline HCL, a considerably larger number of "suppliers" is listed than appears in the N.J. and Pennsylvania formularies. This difference in listings may be the result of the fact that some suppliers do not market nationally, or else (if they do) that the State agencies working with positive formularies have not yet had time to pass upon all the allegedly generic substitutes on the market. Another possibility is that some of these suppliers may not yet have succeeded in obtaining FDA approval for abbreviated NDA's to establish therapeutic equivalence, a matter on which HHS does not express any opinion. It merely lists price ranges (prices to the pharmacy, not prices to the consumer) for pharmacological equivalence, not therapeutic equivalence.

In any event, the "Guide" contains a reprint of a booklet published by FDA listing all drug products with approved NDA's with proposed therapeutic equivalence evaluation. The preface, in part D–1, notes the following observation in respect to therapeutic equivalents:

"However, these products may differ in other characteristics, for example in taste, color, packaging, expiration time, and, in some instances, labelling. If such products are substituted for each other, there is a potential for problems such as patient confusion due to differences in color or shape of tablets, better patient acceptance in certain products because of flavor, better stability of one product over another under adverse conditions of storage, or allergic reactions in rare individuals due to a coloring ingredient, as well as the potential for reduced cost to the patient. An FDA evaluation in no way relieves practitioners of their professional responsibilities in prescribing and dispensing such products with due care to individual patients. In these uncommon circumstances where the characteristics of a specific product, other than its active ingredient, are important in the therapy of a particular patient, the physician's specification of that product is appropriate. Pharmacists must also be familiar with the expiration times and labelling conditions for storage, particularly for reconstituted products, to assure that patients are properly advised when one product is substituted for another."

The N.J. Formulary, October, 1979, page V, captioned "To the consumer" says the same thing more simply:

"You should understand that generic products often differ in color, shape or size from the better-known (and usually more expensive) brand name products. Such differences are to be expected; these differences do *not* affect how well the medication works". (Emphasis in original).

Since the matter comes before the court on motion for summary judgment under F.R.Civ.P. 56, the court must examine the record to determine whether there is a genuine issue as to any material fact, and if not, whether Merck is entitled to a judgment as a matter of law.

Biocraft may not rest upon the mere allegations of its pleading, but its response, by affidavit or otherwise, must set forth genuine issues for trial. Rule 56(e). It presented a number of arguments, dealt with below.

*Merck's use of the colors it uses as functional.*

Since Merck uses a different color for each dosage, i.e., bright blue (10 mg.), lemon yellow (25 mg.), beige (50 mg.), light orange (75 mg.) and mauve (100 mg.), it is argued that this use of color is functional and so cannot provide a basis for a claim of unfair competition or violation of the Lanham Act.

The argument fails to raise a genuine issue of material fact for trial for a number of reasons.

While the concept of color coding has some function for identifying dosage, Merck does not rest its claim on the use of color coding *as such*, but rather on the use of the *same* colors arbitrarily selected by it for the array for this particular drug.

An inspection of the product identification section of the PDR discloses that color coding (along with other arbitrary features) is widely used by many manufacturers, but also that there is no generally used standard for particular colors in the array. For a few examples, see the photographs listed below:

| Manufacturer | Product |
| --- | --- |
| Abbott | Gradumet tablets |
| | Dicumarol tablets |
| | Eutonyl |
| | Ogen |
| | Panwarfin |
| Armour | Letter |
| | Pentritol |
| | Thyrolar |
| Arnar-Stone | Emesert |
| | Sopor |
| Ascher | Zest |
| Ayerst | Premarin |
| Beecham | Menest |
| Brown | Android |
| Burroughs-Wellcome | Lanoxin |
| | Sudafed |
| | Zyloprim |
| Carnrick | Hormonin |
| Ciba | Apresoline HCL |
| | Ritalin HCL |
| Dow | Quide tablets |
| Endo | Coumadin |
| Fellows | Femogen tablets |
| Flint | Choloxin |
| | Synthroid |
| Geigy | Anturane |
| | DBI-TD |
| Ives | Isordil |
| Lakeside | Metahydrin |
| | Metatensin |
| | Norpramin |
| Lederle | Aristocort tablets |
| Eli Lilly | Amytal |
| | Crystodigin |
| | Dymelor |
| | Haldrone |
| | Keflex |
| McNeil | Buticaps |
| | Butiserpazide |
| | Butizide |

| Manufacturer | Product |
| --- | --- |
| | Butisol Sodium |
| | Haldol |
| Merck | Aldoclor |
| | Aldoril |
| | Decadron |
| | Elavil |
| | Triavil |
| | Urecholine |
| Merrell-National | Tace |
| Obetrol | Obetrol |
| Organon | Hexadrol |
| Ortho | Ortho-Novum tablets |
| Parke-Davis | Vectrin |
| Pennwalt | Adapin |
| | Biphetamine |
| | Cholan |
| | Zaroxolyn |
| Pfipharmecs | Pen A |
| Pfizer | Sinequan |
| Reid-Provident | Estratab |
| Robins | Dimetane |
| | Repoise |
| | Robitet HCL |
| Roche | Larocin |
| | Menrium |
| | Valium |
| Roerig | Atarax |
| | Navane |
| Sandoz | Fiorinal with codeine |
| | Mellaril tablets |
| Schering | Estinyl tablets |
| | Etrafon tablets |
| | Gynetone tablets |
| | Naqua tablets |
| | Permitil |
| Searle | Enovid |
| SK & F | SK-Estrogens tablets |
| Squibb | Naturetin |
| | Prolixin |
| Stuart | Sorbitrate |
| Tutag | Aquatag |
| Syntex | Evex tablets |
| USV | Presamine |
| Upjohn | Halotestin tablets |
| | Motrin tablets |
| Warner/Chilcott | Euthroid |
| | Nitroprn |
| Wyeth | Proketazine |
| | Sparine |

This list, which is not exhaustive, is based on pharmaceuticals displayed in color in the Product Identification Section of the PDR. It establishes beyond doubt that various manufacturers make use of color codes to identify different dosages for particular medications of their own, but that the col-

ors used for this purpose, as well as their sequence and array, are variegated and non-standard. There is no standard system, for example, to follow the sequence of the spectrum of visible light, which runs from long to short waves, from red, orange, yellow, green, blue, indigo and to violet. See, e.g., Hoadley, "Essentials of Physics" (American Book Co., 1921), § 529, at pp. 473–474, or any other high school physics test or standard reference work. Instead, the particular colors used and their array are entirely arbitrary on the part of each manufacturer.

This arbitrary selection is quite different from color codes adopted as industry standards. For carbon resistors used in radio and other electronic devices, the Radio Manufacturers Association (RMA) long ago adopted a standard RMA color code making use of the spectrum sequence of colors, plus others, with explicitly assigned values. A series of 10 colors was selected, each for a digit from one to ten, as follows:

| | | | | | |
|---|---|---|---|---|---|
| 0 | – | black | 5 | – | green |
| 1 | – | brown | 6 | – | blue |
| 2 | – | red | 7 | – | violet |
| 3 | – | orange | 8 | – | grey |
| 4 | – | yellow | 9 | – | white |

Bands of color were required to be located around the body of each resistor, starting at one end. The first two indicated the first two significant digits and the third indicated a decimal multiplier from 1 to $10^9$. Thus, a 25,000 ohm resistor would display a red band, a green band and an orange band. A fourth band was used to indicate the degree of precision. A gold band indicated accuracy within plus or minus 5%; a silver band indicated accuracy within plus or minus 10%; and the absence of a fourth band indicated accuracy within plus or minus 20%. See Henney, "Radio Engineering Handbook" (McGraw-Hill, 1941) § 24, at pp. 61–63, or any other basic reference work in the field.

The promulgation of an industry standard for color coding is quite a different matter. Its purpose is to encourage all manufacturers to make use of the *same* color coding system, and effectively places that particular system in the public domain.

Nothing in the record, or for that matter in the Product Identification Section of the PDR, remotely suggests the existence of some industry standardized color code for pharmaceuticals. It shows the exact opposite, namely a wide variety of color codes that differ from manufacturer to manufacturer and from product to product. Hence, while color code systems *per se* are doubtless in the public domain in the sense that a manufacturer using a color code cannot prevent another manufacturer from using a different color code, the uniqueness of each color code for a given manufacturer and product reflects identity and source, which may not be copied.

By affidavit of Carol P. Einandi sworn to June 2, 1980 and filed, together with an accompanying card on which 20 different tablets are mounted in 3 groups by class of color (Tab 3 of exhibits filed pursuant to Memorandum Order dated June 17, 1980), Biocraft presents samples of various medications by various manufacturers. The groupings are those that are one or another shade of yellow, of peach or salmon, or of orange.

What each medication is indicated for, or contraindicated for, is not explained; it was left to the court to look up each one in the product information section of the PDR. See Transcript of June 16, 1980, p. 125 line 18 to p. 126 line 15. This exhibit was tendered to raise an issue for trial that the colors chosen by Merck for Elavil * are not distinctive. It was said at argument (same transcript passage) that all the samples are of anti-depressants.

As the transcript shows, the exhibit is incomplete. Other exhibits, particularly the large exhibit, C–1, showing the different color arrays used by branded and trade-named amitriptyline HCL, and the PDR, indicate that the card of samples shows no more than that it is possible to gather and group anti-depressant medications that are generally yellow, or peach/salmon, or or-

ange, but it falls far short of raising a genuine issue for trial on this point.

A fuller inspection shows distinctive differences rather than similarities. Thus, Merck's Triavil * and Schering's Etrafon *, are combination drugs of perphenazine and amitriptyline HCL in four proportions. Each manufacturer uses a different color of each proportion, as follows:

|       | Merck  | Schering |
|-------|--------|----------|
| 2:10  | Blue   | Yellow   |
| 2:25  | Orange | Pink     |
| 4:10  | Salmon | Orange   |
| 4:25  | Yellow | Red      |

What the exhibit has done is to place in the same group the 4:25 Merck product and the 2:10 Schering product simply because they are yellow, when in fact the table above shows that the comparable dosages are of different colors.

Similarly, Roche's Marplan *, which is placed in the peach group, is marketed in a single 10 mg. dosage and falls into a different category of anti-depressant. The generic active ingredient is iso-carboxazid. It is indicated for use in place of electro-shock therapy for patients when the latter method of treatment is hazardous. It affects many enzyme systems and has a variety of side effects. Its characteristics, contra-indications and cautions are quite different than those of Elavil *, which does not use peach as a color.

Similarly, a sample of Merck's Vivactil * is included. The PDR shows the active ingredient to be protriphyline HCL. It is put up in oval tablets, 5 mg. in orange and 10 mg. in yellow. The 10 mg. Elavil * is blue and the 75 mg. is orange. Beyond that, Vivactil * is for use under close medical supervision, has a more rapid action than amitriptyline HCL, and shows no sedative or tranquilizing action.

Warner/Chilcott's Nardil *, in the orange group, is phenelzine sulfate, described as an anti-depressant and a potent inhibitor of monoamine oxidase (MAO). It is supplied only in a 15 mg. orange tablet.

It is not difficult to page through the Product Identification Section of the PDR to find various tablets that can be grouped as yellow, peach/salmon or orange. For example:

|             | Name               | Manufacturer | Description                        |
|-------------|--------------------|--------------|------------------------------------|
| Yellow      | Fedrazil           | Burroughs    | Decongestant/antihistamine         |
|             | Serpasil-Apresoline | Ciba        | Hypertension therapy               |
|             | Percodan           | Endo         | Analgesia/sedation                 |
|             | Trantoin           | McKesson     | Urinary infection                  |
|             | Zinc tablets       | Mericon      | Zinc deficiency                    |
|             | Compocillin        | Ross         | Penicillin variant                 |
| Peach/Salmon |                   |              |                                    |
|             | Emprazil           | Burroughs    | Analgesic/antipyretic/ decongestant |
|             | Ser-Ap-Es          | Ciba         | Hypertension therapy               |
|             | Darvon-N           | Lilly        | Analgesic                          |
|             | Tempra             | Mead         | Analgesic/antipyretic              |
|             | Metamine           | Pfizer       | Angina control                     |
|             | Mulvidren          | Stuart       | Vitamin supplement                 |
| Orange      |                    |              |                                    |
|             | Zyloprim-300       | Burroughs    | Hyperuricemia therapy              |
|             | Sinulin            | Carnrick     | Sinus congestion/headache          |
|             | Mi-Celrin          | Distar       | Vitamins/minerals                  |
|             | Cyclospasmol-100   | Ives         | Vasodilator                        |
|             | Festalan           | Hoechst      | Digestion/gas                      |
|             | Dorbane            | Riker        | Peristaltic stimulation            |

This sort of exercise can be indulged in easily without proving anything. In *SK & F Co. v. Premo, etc.*, 481 F.Supp. 1184, at 1189 (D.N.J.1979), aff'd 625 F.2d 1055 (CA 3, 1980), at p. 1060, footnote 3, a similar exercise was offered. Premo said it had an exhibit with an array of branded prescription drugs in one column with matching "generic" products in a second column. The court suggested that where a given drug was marketed by brand by a plurality of manufacturers a controverting exhibit could be prepared to show that the generics had a different appearance, and Premo agreed that this was so.

In this case, the exhibits show that Roche, Parke-Davis, Squibb and Merck each market amitriptyline HCL in a series of dosages under unique trade names, and that each uses a different series of colors for the various dosages. It is only the "generic" marketers (except for SK & F) who have copied the trade dress, and they have copied Merck's trade dress, not that of Roche, Parke-Davis or Squibb. Thus the proposition discussed in *SK & F v. Premo*, 481 F.Supp. at 1189 is actually present here.

There can be no doubt that Biocraft can compete with Merck more effectively by copying the latter's trade dress, but this is always so when unfair competition is practiced. It raises no genuine issue for trial.

Unlike *SK & F v. Premo, supra.*, and unlike *Premo v. U.S.*, 629 F.2d 795 (CA 2, 1980), Biocraft does have approval by FDA of an abbreviated NDA as a "me-too" drug. It is also listed as an allowed substitute in the New Jersey and Pennsylvania formularies. This means that, given a prescription that permits it, a pharmacist presented with a prescription for Elavil * may or must fill it with Biocraft amitriptyline HCL; or another approved generic.

This narrows the dispute as to those elements, but the FDA clearance and the formulary listings provide no authority for copying trade dress, any more than for fungibles like baby oil, baby powder and shampoo. See *Johnson & Johnson v. Quality Pure*, 484 F.Supp. 975 (D.N.J.1979).

There are some prescription drugs which reach the patient in the manufacturer's original container. These mainly consist of liquids, salves or creams, and suppositories. See, e.g. Product Identification Section of the PDR for Abbott's Erythrocin Suppositories, Beecham's Conar Expectorant, Lilly's Iletin, Merrell's AVC cream and Vanobid Ointment, Schering's Valisone cream, SK & F's Compazine Suppositories, Squibb's Isophane Insulin and Warner/Chilcott's Anusol-HC.

Most tablets, lozenges, capsules, and the like, however, are dispensed by the pharmacist out of the manufacturer's bottle and presented to the patient in an anonymous vial, usually a dark plastic, with only the pharmacist's label. The patient never sees, for these, the manufacturer's bottle with what may well be a distinctive label. Under these conditions, with narrow exceptions to be noted, the only means available to the manufacturer to provide a means of identification of origin and source is by the trade dress of the drug itself, which is inevitably small enough to be swallowed easily (or chewed).

As noted in *SK & F v. Premo, supra.*, both in this court and on appeal, the small size of the capsule, tablet or lozenge provides too little space for imprinting a clearly readable name. Reliance must be placed in the combination of features which compose trade dress, such as size, shape, finish and texture, and color. Odor and flavor may also be used.

In this case, as in others, there is evidence of palming off. Merck provided documents to Biocraft showing palming off detected in test purchases, and referred to them in its answers to interrogatories. The fact of palming off has not been met by any proofs raising an issue for trial. Nor is it likely that the fact could be seriously contested. That some pharmacists show the brand name of a drug on his own vial label but fills the prescription with another's look-alike generic substitute has been shown in every case of this class the court has tried. It showed in *SK & F v. Premo, supra*, where the tests included not only Dyazide *,

but also Librium * and Darvon *, and it showed in *Hoffman La Roche v. Premo*, D.N.J., Civ. 77–1001, where one prescription contained some genuine capsules and some counterfeit ones, an obviously callous palming off since the pharmacist had to draw from two different supply bottles, each plainly labeled, to accomplish the mixture.

As noted by the Court of Appeals in *SK & F v. Premo, supra*, at p. 1062, it is actionable conduct for a drug manufacturer to put a product in the hands of a pharmacist in a form in which the manufacturer can reasonably anticipate that it may be passed off as another's product even if the manufacturer does nothing else to encourage passing off. And, as noted above, both the "Guide" published by HHS and the N.J. Formulary make clear that color and other trade dress features play no part in allowable substitution. Nor does any of these non-functional features appear to be a factor in securing FDA approval for a "me-too" drug on an abbreviated NDA. "Me-too" deals with bioequivalence, with safety and effectiveness. It is not a license to extend "me-too" to non-functional trade dress features.

*Color and psychotropic drugs.*

Biocraft also argues that there are genuine issues for trial on the theory that for psychotropic drugs, trade dress features such as colors, sizes and shapes are important.

It relies on the affidavit of Harold Snyder, president of Biocraft, who relates difficulties experienced in marketing a generic substitute for Tofranil * (Ciba-Geigy) in 1975, using different colors. The affidavit is silent on the question whether Biocraft's current generic substitute copies the trade dress used by Ciba. His deposition, relied on by Merck, shows that the Biocraft colors used for amitriptyline HCL were intentionally ordered to match Merck's as closely as possible. He makes no mention of the different colors used by Roche, Parke-Davis and Squibb. This affidavit raises no genuine issue beyond the argument that Biocraft can compete more effectively with

Merck if it copies its trade dress. This is not a genuine issue as a matter of law, as noted above.

It relies on an affidavit by Dr. Taylor, which is essentially like that of Dr. Shaefer in *SK & F v. Premo, supra*. It also duplicates the *Premo* affidavit of Edward Stemple, a pharmacist, in respect to ease of identification in emergency situations. This affidavit raises no genuine issue of a material fact for trial. Whatever merit there may be to the proposition that every medication ought to have its own unique trade dress, to be used by every manufacturer (whether by brand or generic name), it has no support in custom or law. In an unfair competition case, such a view is no defense whatever its merit otherwise may be.

To accept such a view as a matter of law would be to compel manufacturers to put up tablets and capsules in blister strips, large enough to carry the imprinting of origin and source. This is the one method some manufacturers have used, to prevent palming off of products taken out of a labelled manufacturer's bottle and putting it in a mislabelled vial. See, for example, in the Product Identification Section of PDR, Abbott's "Abbo-Pac" for Iberit *, and Roche's "Tel-E-Dose" for Valium *. Such systems certainly help prevent palming off, but they obviously will add some cost and expense to the product, and the kind of patient described in Dr. Taylor's affidavit is just as likely to reject a blister strip that says "Biocraft" instead of "Merck". The only way to satisfy that patient would be to allow Biocraft to use Merck's name. The Court of Appeals in *SK & F v. Premo*, p. 1067, rejected that theory.

Unlike the RMA standards for color coding carbon resistors mentioned above, nothing in the record or in any generally recognized literature suggests that standard color coding systems have been adopted for pharmaceuticals, either by custom or by law.

The facts and opinions presented by Dr. Taylor's affidavit in this regard also fail to

raise a genuine issue of material fact for trial because they fail to address the patient who has been on a 75 mg. orange pill, who must be cut down to a 10 mg. blue pill, these being the same colors used by both Merck and Biocraft.

The same observations apply to the affidavits of John R. McHugh, and of Samuel M. Scharr. As with Dr. Taylor's affidavit, the assumption is that the prescription for a given patient never changes. Neither affidavit contains any proof of that essential predicate.

Further materials relied on for this point, all found in the exhibits filed with the memorandum order dated June 17, 1980, are:

Tab 13, a letter published in JAMA of May 4, 1979 from a Los Angeles physician.

Tab 14, a published review article on "Drug Adherence" discussing a wide variety of factors on the subject.

Tab 15, a published article discussing whether psychiatric outpatients take their medications.

Tab 16, a published article on the treatment of depression in general practice (of medicine).

Tab 17, a published article on drop-outs of outpatients under treatment for depression.

Tab 18, a published article on neurotics who fail to take their drugs.

Tab 19, a published paper on the effect of tablet color in the treatment of anxiety states.

Tab 20, a published note on "placebo effects".

Tab 21, a published letter on tablet color.

Tab 22, a published article on placebo effects.

Tab 23, a published article on the effect of capsule color in administering hypnotic treatments (insomniacs).

Tab 26, a published article on elderly patients.

Tab 27, a published article on patient compliance.

Tab 28, a published article on color confusion, urging drug labelling by name.

Quite aside from the matter of admissibility, and taking all of them at face value, none of these raises a genuine issue of a material fact for trial unless this unfair competition/Lanham Act motion is to be converted into a technical case in which the court is called upon to decide what color should be used for amitriptyline HCL. Most of the articles do not address the subject at all. The article at Tab 19 reports the results of a very limited test of the therapeutic effect of tablet color on patients with anxiety states. A single drug was used: oxazepam, in 15 mg. tablets, some colored green, some yellow and some red. Each of 48 patients received a week's treatment with each color in random order. The differences between colors were found not to have statistical significance. Those patients with symptoms of anxiety had the best response with the green tablets. For those with depression symptoms, yellow was "preferred", yet yellow ranked lowest for anxiety.

If color has therapeutic force, the question is one for FDA rather than for the court. Since Elavil *, or amitriptyline HCL is indicated for depression accompanied by anxiety, the court lacks confidence that it would be able to decide whether the tablet should be yellow or green, or perhaps yellow on one side and green on the other. Assuming the court could decide that question, it would then need to decide whether all the dosage strengths should be the same color.

Taking the article at face value, the authors do not claim to know what color has useful therapeutic effect for what patients with what ailments. Nor do they claim that colors effective for oxazepam would be equally effective for amitriptyline HCL.

On the subject of the therapeutic value of color, see *U.S. v. Ghadiali*, 165 F.2d 957 (CA 3, 1948). The N.Y. Times of August 17, 1980, p. 36, reports that the Ghadiali "Spectro-Chrome" is at the National Museum of Quackery maintained by the St. Louis (Missouri) Medical Society.

The other article of interest is that at Tab 28, which emphatically denounces the practice of describing medication as "my little white, round heart pill", and the like, and concludes that (in Canada) specific labelling by name on the vial should be made mandatory.

None of these articles, taking them for what they say, raises any genuine issue of material fact for trial.

Finally, Biocraft presents internal memos and ads of Merck for Elavil *, indicating that Merck has itself made use of its colors for Elavil * as a means for preventing patient confusion. Some of this material uses expressions like those relied on by Biocraft, such as "my yellow tablets" or "my blue tablets", and the like. Resistance to change of color by depressed patients is mentioned, as is simplification of the pharmacist's job and less chance of mix ups in filling prescriptions.

These sales approaches, along with the ads, were expressly aimed at the competition from Roche, which entered the market with Endep *, using a single yellow color for all dosages rather than a color coded arrangement.

To the extent that the memos and ads press the claimed advantages of color coding versus use of a single color they present a legitimate question to be considered by the prescriber, or the hospital pharmacy, to decide.

They do not present a genuine issue of a material fact on the question whether Biocraft, or any other competitor, is free to copy the particular arrangement of color coding long used by Merck alone for its product. Other competitors, including one of the generics, also use color coding but they use different colors than Merck does.

Color coding, per se, as noted above, has a functional aspect, but in the absence of a general standard specifying what colors are to be used for what purpose, the selection of an arbitrary group of colors unique to a particular manufacturer designates source and origin and is not functional.

The materials presented on this point do not raise a genuine issue of a material fact.

*The abandonment claim.*

■ Biocraft argues that Merck has abandoned any right to enforce its claim against Biocraft for unfair competition/Lanham Act violation for copying the Elavil * color code.

This claim is based on the proposition that Merck licensed both Barr and Lederle under its patent, and did not bring suit against either despite the fact that both copied Merck's color code, as did Biocraft.

The presentation shows that Merck's patent is not on the active ingredient, amitriptyline HCL, but on its use as an anti-depressant/tranquilizer under the conditions specified by the "labelling" (i.e., the descriptive text with indications, contra-indications, warnings, etc., shown in the product description section of the PDR).

The active ingredient, amitriptyline HCL, as a composition of matter or a substance, is the subject of U.S. Patent No. 3,384,663, owned by Hoffmann-LaRoche and issued May 28, 1968. Its use as an anti-depressant was not disclosed by that patent, and so Merck was able to secure a "process" patent (see 35 U.S.C. § 100, § 101), No. 3,428,735. Validity of that patent is also in this suit, but is not part of the motion for partial summary judgment now before the court. In fact, on an application for reissue under 35 U.S.C. § 251, filed by Merck and in which Biocraft has participated, the Examiner denied the reissue application. At the time the motion was filed, an appeal to the Board of Appeals of the Patent and Trademark Office had been briefed and argued. This is an alternative method for dealing with the issue of validity, see *PIC, Inc. v. Prescon*, 77 F.R.D. 678 (D.Del.1977).

The cases relied on by Biocraft deal with licensing of a federally registered trademark, and not with licensing of a patent. Of the cases cited, the most informative are *Dawn Donut v. Hart's Food*, 267 F.2d 358 (CA 2, 1959) and *Sterling Drug v. Lincoln Laboratories*, 322 F.2d 968 (CA 7, 1963).

In *Dawn*, the trademark "Dawn" had been registered for a doughnut mix and

other mixes for baked goods sold to bakers, and had licensed some bakers who agreed to use its mixes exclusively, to use the "Dawn" trademark in advertising and packaging materials. The defendant did not sell mixes, but sold at retail doughnuts and other baked goods under the name "Dawn" (innocently and without awareness of plaintiff's registration) in a 6-county area around Rochester. Because the record lacked evidence of the extent to which Dawn supervised its licensees, the matter was remanded, and the denial of defendant's counterclaim (grounded on abandonment) was meanwhile affirmed. As to injunctive relief, the trial court's denial as to "baked goods" (not mixes) was affirmed because there was no competition in the 6-county area between the parties, but the court also ruled that on a future showing of intent to use "Dawn" at the retail level in defendant's market area, an injunction would issue.

In the *Sterling* case, plaintiff marketed a line of "external use" products for diaper rash, under the federally registered trademark "Diaperene". Defendant began to market an oral medication for the same condition, under the name "Dyprin". In reversing the trial court, the Court of Appeals ruled the name was confusingly similar and so was likely to deceive purchasers as to source or origin by attributing defendant's product to the plaintiff. As to abandonment by licensing without adequate supervision, the trial court was reversed because the record showed that *Sterling* itself, or by wholly owned subsidiaries (the licensees) manufactured and marketed all its products.

Nothing in the record here suggests that the registered trademark Elavil * has been licensed by Merck to anyone, or that it has licensed anyone to use its unique array of color-coding for Elavil *.

The materials do show that Merck, although it licensed under the patent, did not license the color code and expressed to the licensees its displeasure at their copying the color code.

It is also not in dispute that Biocraft was the first to copy Merck's trade dress, and that the others followed suit. The record shows that Biocraft supplies a considerable number of distributors. See The Pennsylvania Formulary, Exh. C–2, and the discussion in par. 1 of page 3, supra.

This being so, the court sees no genuine issue of abandonment when the fact is that Merck has asserted its claim against Biocraft in the 1977 suit. No precedent the court is aware of requires that everyone engaging in unfair competition be sued simultaneously, and none has been cited. The long experience is that the prudent course is to bring suit first against that party perceived to be the initiator of the piracy. If unfair competition/Lanham Act violation is established against the leader, the others are likely to fall into line.

■ A license to practice a patent, see *Dawson Chemical v. Rohm & Haas*, 448 U.S. 176, 100 S.Ct. 2601, 65 L.Ed.2d 696 (1980), is not a license for a trademark or for copying trade dress, as a matter of law, and so the contention fails to raise a genuine issue for trial.

*The discovery aspect.*

■ Biocraft argued at the June 16th hearing that it had not had time to complete discovery, and that Merck had failed to provide complete answers to interrogatories. It presses the theme that a party faced with a summary judgment motion is entitled to have discovery to enable it to obtain evidence to present a genuine issue on some material fact in order to oppose the motion.

There is no difficulty with the general proposition, but in this case Biocraft misapplies it. As noted above, the present motion was served March 24, 1980, with a return date of April 14, 1980. It was continued to May 12th, then to June 9, and finally to June 16, 1980. Nearly 3 months elapsed from service to argument, which is ample time for discovery of just one genuine issue for trial.

When the motion first came on, Biocraft asked for an adjournment of 3 months for discovery. The court allowed one month, and it was eventually adjourned for more than a month beyond that.

If there were some genuine issue for trial, this was ample time to obtain and present it. Discovery from the adversary is not the only source of information. Considerable information can be obtained from generally available sources at much less expense, and more rapidly, than by formal discovery. Considerable information is published, as in the PDR. Salesmen in the field, who are in contact with customers, are prime sources of what the competition is doing.

A witness like Dr. Taylor, who claims to be Director of the Office of Medical Care Standards of the Health and Hospital Corporation of New York with 17 institutions and more than 10,000 beds, or the Corporation's purchasing agent, must have information about who is marketing amitriptyline HCL and in what colors and doses. The same is true of Mr. McHugh, president of Retired Persons Services, Inc., and Mr. Scharr, who has been with the NRTA/AARP pharmacy in Hartford since 1972, and whose facility buys preferably from manufacturers rather than wholesalers.

All three affidavits are couched in generalities. None addresses the specific subjects involved in the case. None addresses whether they would buy the product made by Phillips-Roxane for SK & F if it were the least expensive, even though the color code is different than Merck's.

Biocraft's exhibit of yellow, peach/salmon and orange anti-depressants had no samples in blue, brown or mauve, yet it could not explain why they were not on the chart even though Biocraft itself makes those colors. See June 16 transcript, pp. 135–136. The response was that Biocraft had limited discovery. Yet, it obviously needed no discovery to know what it made itself.

A reading of the September 27, 1977 deposition of Harold Snyder (President of Biocraft) discloses that he has adequate background and experience in the field to know where and how to gather information without discovery, including the ability to obtain samples of competitors' products by purchase from drugstores as a pharmaceutical manufacturer (i.e., without prescription), see Tr. p. 35, and including access to customers, which include distributors and chain drug stores among others, Tr. pp. 18–19.

The clear impression from the hearing was that the claim of inadequate discovery time was raised for the purpose of delay, and the court so finds. This is not a case where the motion was heard without opportunity for discovery. Nearly 3 months elapsed from when the motion was served; adjournments were allowed for discovery, and the time allowed was adequate not only for that purpose but also to gather information that should have been easily available, if it existed, without discovery.

On this aspect of the case, the court finds that Biocraft was afforded adequate time. The fact that it was unable to produce anything to show the existence of a genuine issue of a material fact shows, if anything, that there is no such issue to present, not that more time was needed.

*The Answers to Interrogatories.*

Among the materials before the court on the motion was the fact that documents had been produced to Biocraft on document request, and answer to interrogatories related thereto. The documents themselves were reports of market surveys to ascertain the existence of any passing off of product imitating or copying Merck's trade dress for Elavil *.

At first, Biocraft argued that Merck could not rely on its own answers to interrogatories propounded by Biocraft because the answers were self-serving. When the court pointed out that party testimony and party affidavits are also "self-serving", yet admissible, Biocraft advanced the argument that the answers were not on personal knowledge. In any event, Biocraft was allowed an opportunity to submit a memorandum, which it did.

Biocraft cites *Schwartz v. Compagnie General, etc.*, 405 F.2d 279 (CA 2, 1968); *S & S Logging Co. v. Barker*, 366 F.2d 617 (CA 9, 1966); *H.B. Zachry Co. v. O'Brien*, 378 F.2d 423 (CA 10, 1967); and *Maryland v. Hatch*, 198 F.Supp. 1 (D.Conn.1961).

The *Maryland* decision, of course, reflects what was common practice in many courts before the 1963 amendments added answers to interrogatories to the materials to be examined on a Rule 56 motion.

In *Schwartz*, the answer did not present a fact at all, besides which there was no verification. The other cases generally support the proposition that any material of a fact nature must be such as to be "admissible". This is not the same thing as requiring that it be on "personal knowledge".

There are many forms of proof that are "admissible" evidence despite the fact that the witness or affiant does not have personal knowledge of the fact testified to, even in criminal cases. For a very recent discussion by the Supreme Court of the United States, see *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) where the court observed (448 U.S. at 62, 100 S.Ct. at 2537, 65 L.Ed.2d at 605) that "The basic rule against hearsay, of course, is riddled with exceptions developed over three centuries."

While it is not necessary to decide the point on the present motion, as noted below, the documents are evidently test survey results, for which the foundation usually is Fed.Ev.Rule 803(6), since market surveys are generally conducted by shoppers under the supervision of some employee in charge of the program. Where that foundation is not shown, then they may well be admissible under Fed.Ev.Rule 803(24).

It is no more necessary to bring in individual shoppers from various parts of the country to personally establish individual instances of passing off, than it would be to call in laboratory technicians who conducted individual tests reported in laboratory notebooks, or salespeople who made particular sales recorded and reflected in a party's books of account. Even individual sales slips are often not retained at all after the transaction has been posted in books of account.

The question arose indirectly at the hearing when Biocraft made the assertion that "In this case there is absolutely no evidence of record of palming off," Tr. of June 16, 1980, p. 151, line 25 to p. 152 line 1. The court then asked whether there wasn't an interrogatory about field sampling, and it turned out that there was, in Interrogatory 3 of Biocraft's third set and Interrogatory 9 of its current set, that the answer given in May summarized the results of the field sampling, noting that in a Florida survey 26.6% of the pharmacies substituted another product for Elavil *, and that 73.9% of the generics used were illegally labelled as "Elavil *" or "Elavil * substitute". The test reports themselves had been supplied on document request, they had been looked at but not studied, and Biocraft could not or would not say what they showed. See Tr. of June 16, 1980, p. 152, line 3 to p. 157, line 4. The interrogation of counsel is one of the tools the court is expected to use on a motion for partial summary judgment such as this, see Fed.R.Civ.P. 56(d).

In any event, the colloquy indicates that when the claim was made that there was "absolutely no evidence" of palming off, it became clear that the assertion did not mean what it seemed to say. Evidence of palming off had been provided, whether admissible in that form or not, and Biocraft ignored it claiming lack of time and the like.

This posture is similar to that taken by Mr. Harold Snyder, Biocraft's president, at his 1977 deposition. Having testified that he chose pill sizes about the same size as Merck's, and having asked Colorcon, who manufactures the coatings to get close to Merck's colors, tablet by tablet and size by size, he was asked whether it ever dawned on him that some druggists might just substitute Biocraft's product for Merck's. After some sparring and hedging, he said:

"A. You're asking me a question if I care; if they're doing it legally, that's fine. If they're not doing it legally,

*that's their problem.* I care about it that they do it legally."

See 9/27/77 Transcript, p. 62, line 3 to page 63, line 12. (Emphasis added)

As observed above, it is not necessary to rule on the admissibility of the answer giving data summarizing the results of the field sampling because, as ruled by the Court of Appeals in the SK & F case, Slip opinion p. 9, it is actionable conduct to put the product in the trade channels in a form in which it can reasonably be anticipated that it may be passed off as another's product. Evidence of actual passing off is not required. It is enough that the trade dress is confusingly similar such as to make it likely that the product of the counterfeit copy will be taken as the genuine article as to source.

Merck has shown evidence on the motion that its product and Biocrafts' are essentially of the same appearance. Biocraft has raised no genuine issue in this regard, nor could it because Mr. Snyder has testified that the Biocraft product was intentionally and purposely made to copy Merck's, and since FDA has approved Biocraft's product as bioequivalent, with the intention and purpose that its product be sold in place of Merck's.

The question raised is one of law. Biocraft is free to compete with Merck (putting aside the patent issue), but the law is against it on the copying of trade dress.

For these reasons, the colloquy about the answers to interrogatories raises no issue because the same result follows as a matter of law whether that material be considered or not.

Whether the trade dress is so close as to be unreasonable, and likely to confuse, is a material fact, but there is no genuine issue on that fact. The purported issue was that there was no proof of actual passing off, and that fact is not a material fact.

*Disposition of motion.*

The motion filed by Merck is asserted to be for summary judgment under Rule 56(a) [for claimant] and Rule 56(b) [for defending party]. The Rule 56(a) motion relates to

Merck's Second and Third Counterclaims (as amended by the pre-trial order dated March 12, 1979) and the Rule 56(b) aspect relates to the claims in Counts II and III of Biocraft's complaint.

Biocraft's Count II asks for a declaratory judgment determining that Biocraft is not unfairly competing with Merck by manufacturing and marketing its amitriptyline HCL tablets in the same colors, sizes and shapes as those used by Merck for its Elavil * tablets. Biocraft's Count III seeks to enjoin Merck from charging Biocraft and its customers with unfair competition because of the Biocraft activity described in its Count II.

Merck's Second Counterclaim asserts unfair competition by reason of the conduct described in Biocraft's Count II, while its Third Counterclaim asserts false designation of origin of goods in violation of 15 U.S.C. § 1125(a).

The motion itself specifically asks for summary judgment adjudicating that Biocraft has (1) unfairly competed with Merck in the respects indicated and (2) violated 15 U.S.C. § 1125(a) thereby as a false designation of origin.

As thus presented, the motion actually comes within Rule 56(d) because the judgment sought will not be one on the whole case. Count I of Biocraft's complaint challenges the validity of Merck's "process" patent, U.S. No. 3,428,735 issued February 18, 1969, while Merck's First Counterclaim alleges that Biocraft has been and continues to infringe that patent. The patent aspects are not before the court on the motion.

On a motion for summary judgment, the court's function is relatively narrow. On examination of the materials listed in Rule 56(c), (d) and (e) the question to be decided divides into two main segments: (1), is there any fact on which there is an issue which is genuine and, if so, is the fact a material one; and (2) if there be no such issue, is the moving party entitled to the judgment sought as a matter of law. In that event, the rule directs that the judgment sought "shall be rendered forthwith".

As the 1963 amendments make clear, when a moving party presents proof of facts, the existence of a triable issue may not be claimed by reliance on mere allegations or denials of his pleadings. He must go beyond that, by affidavits, depositions, answers to interrogatories, admissions, and the like, to set forth "specific facts" showing that there is a genuine issue for trial. Failing such a showing, summary judgment is to be rendered against him if otherwise appropriate.

The principles of law applicable to unfair competition and to Lanham Act violation in respect to false designation of origin are essentially the same. The unfair competition principles are derived from State law; those of § 1125 rest on like principles plus the element of causing the goods to enter into commerce.

However, if there be an issue of fact shown, if the issue be genuine and if the fact be material, then summary judgment cannot be granted no matter how overwhelming the proofs on the issue may be, because the court cannot try any such issue on a Rule 56 motion. If there be ambiguities or alternative reasonable references, doubts arising therefrom are to be resolved in favor of the party opposing the motion. This does not mean that the moving party's proofs must be beyond any doubt, or that controverting facts without a viable legal theory to support them are sufficient, or that purely speculative issues should be preserved for trial.

█ The underlying facts here are not in dispute at all. Both parties put up the same active ingredient as a series of tablets in dosages ranging in 10 mg., 25 mg., 50 mg., 75 mg. and 100 mg. amounts. [Biocraft evidently does not market a 150 mg. tablet, which Merck puts up in a capsule-shaped tablet, and so that dosage is not in the case]. The active ingredient is a white powder. Merck's tablets are round, convex or dome-shaped, and film-coated with a different color for each dosage. The 10 mg. and 25 mg. have been marketed by Merck since 1961. They are the same physical size (¼ inch wide, ⅛ inch thick), and the 10 mg. is blue, while the 25 mg. is yellow. In 1967, Merck added a 50 mg. tablet which was larger (⁵⁄₁₆ inch across by ³⁄₁₆ inch thick), and colored it beige. In 1977 it added a 75 mg. tablet in slightly larger size (⅜ inch across by ⅛ inch thick) and colored it orange, and a 100 mg. tablet, still larger (⁷⁄₁₆ inch across and ³⁄₁₆ inch thick), and colored it mauve.

Roche, which owns the patent on the active ingredient itself, entered the market in late 1975 or early 1976, and makes tablets in the same dosages as Merck, but it uses a single color (light orange) with progressively larger sizes for the first three, yellow for the 75 mg. and pink for the 100 mg. Thus, Roche's trade dress differs from Merck's, which was the only user of its arbitrary colors for particular doses until Biocraft began copying in about March of 1977.

Mr. Snyder first examined the Merck tablets in 1976 (Tr. of 9/27/77, p. 34) and copied the colors because he wanted to imitate the market leader (Idem., p. 44), and come pretty close as to size (Idem. pp. 55–58). Biocraft's abbreviated NDA was approved in January or February 1977 (Idem., p. 28), except for the 100 mg. tablet which was approved in Mid-1977 (Idem., p. 104).

The other brand manufacturers entered the field later than Biocraft: Parke-Davis (Amitril *) in about April, 1978, Squibb (Amitrid *) in about January, 1979, and then used different color coding from Merck's, see Exh. J–1. Only Biocraft and the other "generics", beginning with Biocraft about March of 1977, copied Merck's trade dress (except for SK & F, whose color code is different than the others and unique to it).

Not only is no fact presented by Biocraft to raise a genuine issue for trial on any of these matters, but they are, in effect, admitted. The same is true of Biocraft's intent and purposes in copying the trade dress.

All that is left is a matter of law, and as to that the law entitles Merck to the declaratory judgment it seeks.

Submit order granting summary judgment declaring that Biocraft's copying of

Merck's trade dress for Elavil * is unfair competition, and a false designation of origin in violation of 15 U.S.C. § 1125(a), on Merck's Second and Third Counterclaims, and dismissing Biocraft's Count II and Count III.